Mr. Chief Justice, and may it please the Court. Across Texas's 572 executions spanning four decades, the state's policy was to allow a spiritual advisor to be present in the execution chamber to lay hands on a condemned inmate and to audibly pray. In 2019, that long-standing practice changed suddenly when the state chose to forbid any religious advisor from the execution chamber. Ramirez and other inmates fought to preserve their religious exercise rights to spiritual advisor presence, and while these challenges proceeded, the state withdrew Ramirez's 2020 execution date in exchange for withdrawal of his Section 1983 petition. Six months later, the state reset Ramirez's execution, followed two months after that by a reversion to allowing in-chamber spiritual advisor presence. The state then waited months more to reveal first a ban on touch, only later it banned the spoken word. Either the state merely delayed revealing these new restrictions or, worse, added them piecemeal while Ramirez sought redress through the grievance system. Either way, the state's actions rendered that system unavailable under the PLRA. The state now argues that Ramirez's resort to litigation came somehow far too late, but also six days too early. TDCJ's own history and practices, as well as the current approaches of the federal government and states like Alabama, prove that Texas's restrictions on touch and prayer are not the least restrictive means of furthering its proffered execution interests. Mr. Ramirez should prevail as a matter of law under our LUPA. If the court determines, however, that the state should be allowed another chance to attempt to meet its burden, this court should remand for an evidentiary hearing in which both sides may develop the record. I welcome the court's questions. Our counsel, has Mr. Ramirez always requested that hands be laid on him? I mean, that's an affidavit from Pastor Moore. We're talking about Mr. Ramirez. I think, Justice Thomas, you can assess the sincerity of Mr. Ramirez's belief by looking at the best evidence that there is in the record, which is a seriatim, one handwritten signed grievance after another, repeatedly requesting the same thing. You have people filing grievances in non-religious contexts, and that's not evidence of their religious beliefs. It's evidence that they obviously don't want to be executed. And in some instances, they're gaming the system. I guess my question is, can one's repeated filing of complaints, particularly at the last minute, not only be seen as evidence of gaming of the system, but also of the sincerity of religious beliefs? Well, Justice Thomas, I can certainly see how a hypothetical inmate perhaps filing a last-minute such request might so be construed. I can only speak as Mr. Ramirez's attorney, and I do not play games. There's no dilatory tactics in this case. When the state set the execution date in the year 2020, I filed the 1983 lawsuit, and the state asked me to dismiss it without prejudice. When the state got a new death warrant in the year 2020, Mr. Ramirez immediately filed grievances. There was no waiting there. And the state responded by handing him a copy of this new policy they promulgated on April 21, 2021. Mr. Ramirez has always, Justice Thomas, filed these grievances within days of learning. In that case, he learned from the director of chaplaincy that there would be this no-touch requirement that was suddenly imposed in the year 2021. And yet it was the state that delays. There is, I think, a very alarming contention you see in the Riley affidavit, the state laws and their materials, where she said that as the execution date gets quicker, the state regards these grievances and tries to process them all the faster. That's not at all what happened here, Justice Thomas. Mr. Ramirez filed his request in Level 2 grievance in July of 2021. The state sat on this for six weeks until we were right on the cusp of the execution. I would contend if there's any delay here, Justice Thomas, it's on the part of the state. There's no insincerity as to Mr. Ramirez's consistently stated beliefs, and Mr. Ramirez has repeatedly asked as quickly as possible for the least relief as he is required to from the prison system. Thank you. Counsel, what is your client's position on is it touch anywhere on his body that will satisfy his religious needs? Yes, that's correct. Pastor Moore, when he lays his hands on his congregants, can touch anywhere on the body. So, for example, Pastor Moore can touch Mr. Ramirez's foot, an extremity on the complete far end of the body from the point at which the IV line will be inserted into his arm. So, yes, that would satisfy the religious exercise. How would you analyze the case? Would it be any different than how you're analyzing it in your case, if the religious conviction were somewhat different and the hand had to be on the forehead, on the heart, something like that? I can certainly see how it might be a little closer, and yet in such a religious exercise, if that was in fact what the religious exercise generally was, as we have with Pastor Moore and his congregants, then touching on the other side of the body I still don't think would present a problem because there's no touch anywhere near the IV. For example, if the IV is in one arm and the prison doctors ultimately need to touch the other arm to monitor pulse, there would be no problem with Pastor Moore touching that other arm, similarly with the heart. These are still places pretty far removed, not as far away as the foot that I mentioned, but still pretty far removed from the point at which that IV will be injected. I don't think either the hand or the heart is very far removed from the IV injection site. They're obviously closer to the IV injection site than the foot is, and yet I think the important point, Chief Justice, is that under ARLUPA the courts are not allowed to rewrite the religious exercise for the inmate so as to accommodate the religious exercise, as that term is narrowly defined under ARLUPA, is that as the inmate and his religious precepts dictate, Mr. Ramirez does not need any place on the body even closer to the IV site to be touched. Just the same as Mr. Ramirez's religious exercise is not satisfiable with the statement. Right. I'm trying to get a sense of the standard of review as applied in this situation, and what would the analysis be if, for example, his religious beliefs required three people to be present? Yes. Mr. Chief Justice, ARLUPA is specifically designed to take these matters of religious exercise up on an inmate-by-inmate basis. As the Court has said in several cases, the classic rejoinder of bureaucrats throughout history, if I make an exception for you, I have to make it for everyone. Very eloquent. It was not my words. The logic being that this does have to be taken up on an inmate-by-inmate basis. If some inmate had genuinely held a sincere religious observance and it was to be established that this needed to be done at a particular point in the body, I guess that might be a different case. But to answer your question directly, the standard is exactly that from the statute, to take it up on an inmate-by-inmate basis. That will be the next case, and then there will be the next case after that, and the next case after that, where people are moving the goalposts on their claims in order to delay execution. At least that's the state's concern. There are four issues you need to run through. Sincerity, Justice Thomas's questions get at that. Substantial burden, it can't just be a burden, it has to be a substantial burden. And then two, I want to ask about compelling interest, the state's compelling interest, and least restrictive means. So let me just focus on the compelling interest, because I think the state's compelling interest here is challenging for us to analyze, because I think it is in reducing risk, risk of something going wrong in the execution chamber. And I think the state is saying, we want the risk to be zero of a problem. That's when they were excluding everyone following our equal treatment principle that we enshrined in Murphy or enforced. So we want the risk to be zero. Now that it looks like, okay, well, there has to be someone allowed in the execution room, a religious minister, we want the risk to be as close to zero as possible of something going wrong. Why isn't that a compelling interest when the state says, we want the risk to be as close to zero as possible, and if we allow touching and the like, the risk increases? And you might say, ah, there's really still not too much of a risk, it's okay. But the state is saying, no, we want the risk to be low. How do we as a court say, no, actually, state, you're compelling interest in reducing the risk to close to zero, it's not good enough, it's not compelling. How do we do that? Yes, Justice Kavanaugh, my answer is somewhat different than you phrased it at the end of the question. I did not dispute at all the state's palpable interest in having a secure environment. Prisons are all about risk. It's about risk. Yes, I understand. It's about degree of risk. Yes. And we all agree in the security, and I appreciate your answer on that, but the state is saying, we want the risk to be really close to zero of a problem. And you're saying, you can do this without a problem, and the state's saying, that increases the risk of a problem. And I don't think you can dispute that. It does increase the risk of a problem some, but you might want to respond to that. My answer, Justice Kavanaugh, would be this. I mean, risk as a statistical matter is based in empirical data. We have a vast empirical data set of hundreds of executions over decades. I'm sorry, that doesn't move me at all, because those were state chaplains who were officials of the state, which was the whole point. That's what created the equal treatment problem to begin with. Those were largely Christian, right? Yes. That created the equal treatment problem. So that doesn't work. What they're worried about is someone from the outside coming in, and you never know. And it's a very fraught, Judge Higginbotham's concurrence, it's a very fraught situation with a lot of potential for issues. At least the state thinks so, and I don't know how we sitting here, we're not in the execution room, we don't know, how we can question the state's interest in keeping the risk of a problem close to zero. I think you're saying, the risk isn't that much. But how do we analyze that? Well, the answer, Justice Kavanaugh, is that while I certainly understand the state's logic, we hired the prison-employed chaplains, therefore we could fire them or not renew their contract. There are substantial laws in the books in every state criminalizing interference with a law enforcement officer in the disposition of his duties. There is not a single example in history where any spiritual advisor, and the state allowed these as a matter of course, has ever interrupted a proceeding. What the state can do, to answer your question directly, Justice Kavanaugh, is exactly that, which Pastor Moore did. He went and drove hundreds of miles to visit with these folks at a particular location. He signed a penalty-backed pledge. We know the state believes that Pastor Moore was safe to be in the execution chamber. On September 8th, the execution leading up to when this court granted the state, he sat there all day. That's about the facts of this case, I understand it, but I was asking in case, if we rule in your favor here, this is going to be a heavy part of our docket for years to come, would be my sense, given the history of death penalty litigation, which we'll deal with as it comes. Least restrictive alternatives, I want to ask about that. Your basic point on that is, if another state does it, that helps show that there's a less restrictive alternative. I guess, what if a state allows, to use the Chief Justice's example, multiple people in the room? Does that mean every state has to do it? Your answer is no to that? My answer to that would be no, under our loop. How about if another state allows bread and wine in the execution room right before the execution? Does every state have to do that, because it's a less restrictive alternative? No, there is not a, approximately, greatest common denominator or least common denominator. And if another state allows the minister to kind of hug the inmate, does every other state have to do that? No, one state doing a first mover does not calibrate a national standard, if so effective. And why, how could we as a court say, actually, two people, now one person, yes? Like, what neutral principle are we relying on there when other states do it? And we say, well, other states do it, but that's not the least restrictive alternative. Justice Gamma, I don't think there will be a micromanagement problem. No one is asking federal courts to micromanage. I think the issue will remain that you will still have most recent national standards, as demonstrated by that national standard. Empirical basis, what we see, the federal government did just last year, and the state of Alabama has changed its rules just in the last six months and carried out such an execution only two weeks ago. And perhaps I could point out, the state of Alabama actually affords more religious exercise in that execution of Willie Smith. That's the argument that I'm a bit concerned about. And you make strong arguments, so I'm not, I'm just testing them here. The argument I'm concerned about is once you get one state doing this, every other state has to follow. And then when you get the two, you know, I've already said it, and you citing Alabama from two weeks ago, that's going to happen over and over over the next few years, I would imagine, maybe not, where states are being sued by inmates in the last days before an execution, saying another state does it different, I want this. Now how do we deal with that? Sure. Under ARLUPA, a state certainly can get to some point where they have inhibitions greater than perhaps their sister states. But if a state wants to do that, they would have to show evidence in the record when the burdens shift. After the plaintiff satisfied his first prong under ARLUPA, they would have to show that we studied this issue or we come to a conclusion, an informed conclusion, that we need to reach a different result. In the Ramirez case, there was no evidence of risk put into the record. If a state like Texas, and if there's... Well, the risk is inherent in having another person in the room, I think. But you're not saying we can, if we rule for you in this case, the concern about future litigation would go away. If you're saying there's kind of a bright line because there's a historical practice of audible prayer and touching, but we're not looking for anything else in the execution room. But you can't say that, can you? I don't know that I would agree with that, Justice Kavanaugh, respectfully, because I think perhaps what the state has done here is recreated, come full circle, back to the same issue which impelled the opinion in Murphy, by which I mean, if TTCJ chaplains, those employees, are able to touch and pray, and now there's a new rule the state has told us in a surreal fashion last summer, that the outside non-TTCJ employees are not allowed to touch and pray, now you have a new form of denominational discrimination. Over the last couple of years, we have had a whole series of stay applications that present issues that are related to the one that is presented here, and each one has been different. Like virtually every application for a stay of execution, they come to us at the last minute, the day before, sometimes the day of, and what you have said so far suggests to me that we can look forward to an unending stream of variations. So you would be satisfied, you have told us you would be satisfied, if Pastor Moore touches Mr. Ramirez's foot. But what's going to happen when the next prisoner says that, I have a religious belief that he should touch my knee, he should hold my hand, he should put his hand over my heart, he should be able to put his hand on my head. We're going to have to go through the whole human anatomy with a series of cases, and you haven't said anything about what you want exactly with respect to audible prayer. What type of prayer, when, how loud, what exactly do you want to start out with? Yes, I'm going to start with audible prayer. Yes, prayer should be non-disruptive audible prayer in the ordinary style of how people pray. When, to answer your question directly, Justice Alito, is after the pastor and the warden come in together, after the drug team has already inserted the IV lines. Do you want it throughout the execution, do you want it up to the point where the prisoner loses consciousness or dies? Yes, the pastor can step away, what they agreed to do in Alabama, is before, after the prisoner passes, when the pastor steps away when the consciousness assessment is performed, and then remains to the drapes are closed and removal and so forth. So the prayer, to answer your question, Justice Alito, yes, would be after the lethal injection begins, and then until the point when it's passed in a non-disruptive way. That's helpful. Can you say anything to us to relieve us of the fear that we are going to get an unending stream of variations about both of these things,  the singing, chanting, number of people in the room. Is this just what's going to happen? The lower courts are going to have to deal with this on the eve of every execution, and we're going to get these at the very last minute and have to decide them. The difference between the factual information presented to us in these briefs and what we received in all of the previous stay applications is like night and day. Justice Alito, I could talk about timing, and then I'll switch to the second. With regard to timing, in Mr. Ramirez's case, the 1983 petition was filed a month in advance of the execution date, and the district judge entered a scheduling order when the motion for stay would be filed, the response reply. So all those proceeded very much apace, and the Fifth Circuit ruled within a few days. So everything proceeded here on a listed schedule. How far in advance of the execution did it come here? The Fifth Circuit, I believe their opinion issued on Labor Day. The court was up early that morning. I wrote the stay application the following day. The next day, the state responded, and I filed the reply that same day. How far in advance of the execution date was that? I believe the execution date Tuesday, the 8th was a Tuesday. I don't have a calendar in front of me, but I believe that was correct. No, it was the 7th. The Fifth Circuit opinion issued on the 6th. The stay application was filed on the 7th. The state responded in the middle of the day of the 8th, and the reply was filed later that same day. Well, we get these at the very last minute, and we're going to continue to get them at the very last minute. Well, I don't know that, Justice Alito, you necessarily will get them at the last minute. I think it has to be remembered that Mr. Ramirez, starting in his execution, was first scheduled, started to file step-one, step-two grievances. Then the state changed their policy. The state then proceeded to list these restrictions in seriatim in this piecemeal fashion that came from a letter from the general counsel and so forth. If the state is so worried about these things coming up in the last minute, all they have to do is actually tell us what the rules are. In other words, there's not a single thing in the prison manual that anyone can see or in the form that the pastoral ward was told to sign that says what he could or could not do. If the state would simply tell us what they want instead of having to make us try to figure out by guessing. You and Texas can argue about who did what and when and all of that, and it's relevant to some of the issues. But to get back to my point about the unending stream of variations, I take it what you said as well. Each one of these is different, factually different. Prisoners have different religious beliefs. Each one has to be analyzed separately. Different states, different execution chambers, different sizes, different religious beliefs. Each one will present its own unique question. Maybe that's the way it has to be. I'm not an expert in religion. I don't know all the religions in the world. But I think similar concerns were voiced in this court in the early Religious Freedom Restoration Act cases, in the Church of Lumi and so forth. Even in the Holt v. Hobbs case, the question was specifically asked are these issues going to bubble up one half an inch beard at a time. They're not going to present in that order. I don't think any religion has striated that there must be a touch on this particular piece of the body. What we're talking about here is a laying out of hands doctrine that the minister does with all of his congregants as they're nearing the point in time that they die. If some other inmate has a well-established, sincerely held belief, and that can bear their burden under our LUPA on the first prong, then perhaps that will be or it will not. Well, do you think in real LUPA a court can say you are whatever. You are a Catholic. And so I am going to see what the teaching of the Catholic Church is on this question. Is that the way this is resolved? Can the prisoner say, well, yes, I'm a Catholic, but I have my own personal beliefs about this. Would we not have to honor that person's own sincere, individual, perhaps unique religious beliefs? Isn't that the way real LUPA works? To answer your question, the first part of your question does lead to no. But you said this exactly opposite to our LUPA. No, you cannot inquire as to the centrality, ultimate correctness theologically of a sincerely held religious belief. I think the point was made in the Tenth Circuit in Yellow Bear that the question for federal district courts in that first prong of our LUPA is really just, is the inmate trying to perpetrate a fraud on the court? Are they lying to try to get some benefit they would otherwise not be entitled to in the secular context? Once they do that, the burden shifts to the state. Our LUPA is written this way. And all of the equities, the victims and so forth, were all taken into account and cognized by Congress in the statute passed nearly unanimously over 20 years ago. Thank you, Counsel. Justice Thomas, anything further? No. Justice Blunt? No. Justice Alito? No. Counsel, under the Turner Standard, a generalized security interest would have been enough to defeat a claim. RUPLA changed that, and whether we like it or not, it requires the state to address each individual person's need. And a risk analysis that talks generally about a compelling need is not the standard that RUPLA sets. The standard is, is something that you're proposing going to interfere with this execution? Now, I looked at the pictures that I was provided, and the other side gave a bunch of reasons. They said, it'll block the view. But I saw the picture of the prison, and the window, at least by the foot, doesn't block the view. So, where you want to stand is not going to block the view. They have fears that an unknown pastor could, and this goes to Justice Kavanaugh's concern, that an unknown pastor could go to the IV line, could go to the manacles, etc. But the manacles are nowhere near there. The minister has a person standing with him. I'm assuming that your argument is that every security risk they present is just not presented by these facts, correct? Correct, yes. And going back to the response that Justice Kavanaugh and Justice Alito have expressed, It's not us that have to worry about the individualized treatment. Congress has told us that that's what petitioners are entitled to, correct? Yes. And prisoners have to work in good faith to accommodate those needs. They're supposed to, yes. They waited a month to tell you, six weeks to tell you they wouldn't permit the touching or praying. That's not working in good faith, is what you're saying. I never heard Justice Sotomayor worried about no prayer until I got that letter on August 19th. So they can say what it is early and tell people if you have an objection, come in and tell us what you need within a certain amount of time, correct? Yes. That's what you said. Yes. So they can avoid last minute requests by simply setting reasonable guidelines, correct? They could, yes. And acting expeditiously. Yes. They're the ones who waited close to the execution date, correct? Yes. That's your point. Yes. All right. Thank you, counsel. Justice Kagan? Justice Gorsuch, anything further? Justice Kavanaugh? I do have several questions. Judge Higginbotham said in his concurring opinion, while lethal injection may seem straightforward, the actual administration of the judge and pronouncement of death is both delicate and fraught with difficulties, as evidenced by the responses of regulatory bodies and the experience of this court with mishaps in execution by lethal injection. In short, the complexities intending the administration of a judge and the execution procedure and its failures expose the risks of non-medical hands on the body of a person undergoing the procedure. Why do you think Judge Higginbotham is wrong? Well, it's not that I think he's wrong, Justice Kavanaugh. Pastor Moore is definitionally not a doctor. His hands would be on the body. So in that sense, it would be non-medical hands on the body. The way Judge Higginbotham instituted it, though, was no hands means no hands. It's a direct quote, I believe, from his opinion. And yet we know that that would not be true under the state's own logic with a TDCJ chaplain, who has touched the leg, the calf, so forth, for years. And that goes to the risk question that I talked about earlier, because that person has been an employee. But second question, on sincerity, to follow up on Justice Alito's questions. This is a potential huge area of future litigation across a lot of areas. Sincerity of religious claims, and how do we question those? Some things that people have talked about are the incentives someone might have to be sincere, behavioral inconsistencies, Justice Thomas's questions got at that with the complaint, the religious tradition of the practice. What do we look at to check sincerity? Because that's a very awkward thing for a judge to do, to say, I want to look into the sincerity of your claim, but our case law says we must do that. How do we do that? Yes, I was going to argue, yes, well, federal judges obviously would be very worried to look at the religiosity, the correctness of the religious aspects of the claim. Federal district courts judge sincerity, in a manner of speaking, all the time. Credibility determinations are made by district judges in every motion to suppress. It's a little more awkward, I think you'd admit, for a judge to tell someone, you're claiming that you believe this is a matter of religion, but I think you're lying. That's hard to do. Do you agree with that? Well, I don't know that I do, Justice Kavanaugh. I mean, district judges have to unfortunately say they believe in a suppression hearing. For example, a case agent or any other manner of law enforcement witness is not telling the truth. Many experts testify in white-collar cases, on causality. Experts, people have to testify about things all the time, and a district court on a Daubert challenge, for example, has to decide whether or not it's sincere. Sincere is to religious beliefs, to be sure. It might be a somewhat more rare circumstance, but those sort of credibility determinations are made on a daily basis in federal courts in this country. Okay, two more. Sorry, I'll try to be succinct. Justice Sotomayor is quite right in saying that Congress put this standard in place, the strict scrutiny standard. I think the difficulty of applying it is one of the reasons some of us in Fulton had concerns about what might replace Smith. And in this case, it's a good illustration, I think, of the problems that can arise trying to apply a strict scrutiny standard. But just on the relationship of compelling interest versus least restrictive alternative, and when it goes to risk, I mean, I'm still having problems with their saying we should keep the risk to zero. And you're saying, no, you should tolerate a little more risk because Alabama does it. Or because other states do it. And I just as a judge don't know. You might be right. They might be right. I don't know of a neutral principle how to resolve that where they're saying we want the risk lower. We want the risk to be lower than our next door or another state. Justice Gabbard, I think I'd have to respectfully disagree with the premise of that last part of the question, which is that a non-TDCJ-employed chaplain necessarily carries with him some appreciable additional level of risk. I can say – Can I stop you right there? I don't see how you can say that. There's another human being, to go back to Judge Higginbotham,  especially if the person is by definition close to the inmate, spiritually friends, and they're about to die and be put to death. The idea that we can predict how another human being will react in that situation and be sure, as you're saying, that the person's not going to react in a way that they would never react in any other situation. I just don't – I don't know. You might be right, and we'll see, I guess, if you prevail here, how this plays out. But it's not my decision. As a judge, I don't know how I prioritize your assessment of that over the state's. Well, the way I can say that – to answer your question, Justice Kavanaugh, you asked me how I can say that. The way I can say that is that it is incredibly well documented. Every single time anyone – a minister, a reporter, anybody else – goes to see a prisoner, Pastor Moore has been going to see, for example, Mr. Ramirez for five years, longer than I've been his lawyer. I'm not questioning – There's never been an incident. Sorry to interrupt. I'm not questioning the current pastor at all involved in this case, so I don't mean to do that. And the last question I'll finish with this is just the victims. I mean, we haven't mentioned – we've gone a long time – we haven't mentioned the victims' family who filed a brief here, and they've had to go through now four and a half years of postponed executions. And their brief says, In Maria's eyes, Ramirez gets all this publicity like he just won a gold medal, while she and her family are going through all this pain and suffering each time they're told Ramirez will be executed, only to have the courts put a hold on him. We have to think about the victims' family members, too, with this, oh, it's going to be a stay here and a stay there and a stay there. And each time, they're brought to the execution room decades after the crime, where their father was beaten to death and stabbed to death in a parking lot. I mean, I just think we – that's all by way of saying that is a legal point to it. If we're going to rule for you, I think we need some clear lines, so it's – as Justice Alito says, we're not putting future victims' families in the same position, time after time, having these delays. This is Kevin. I have nothing but the greatest sympathy for the family of Pablo Castro. I grieve for them. I feel horribly for their loss. Victims certainly do have an interest in public interest in their proceedings, in finality of executions, of judgments, of so forth. All those victims' interests were specifically taken into account by Congress when it passed the ARLUPA. And that was not even a newfangled concept 20 years ago, somehow, when the ARLUPA was passed. The brief, the amicus of the Beckett Fund, filed where they showed the historical examples of where pastoral, spiritual guidance has been given throughout history to people as risible as the Nazis, and the point was made, it was not a luxury afforded for who those people were, but something that religion affords in larger society because of who the society is. And Congress accounted for all of that when it passed the statute, and that's how the equities are to be balanced out. Thank you. I appreciate your good answers. Thank you. Justice Barrett? I have one question. So Justice Kavanaugh has been asking you about how strict scrutiny would apply here, and Justice Kavanaugh said that the compelling interest that the state has is in the reduction of risk because, understandably, the state wants that risk to be zero because the consequences of a botched execution are quite high. I think how we define the compelling interest matters a lot for how the strict scrutiny analysis pays out. So I'm just wondering how you would characterize the state's interest. Would you characterize it the way that Justice Kavanaugh does, or do you have a different articulation of how you think the compelling interest should be described? I think I would characterize it respectfully slightly differently than Justice Kavanaugh did, Justice Barrett, and that is that the compelling interest is in an execution that is done in the humane way, in the safe way for all the circumstances that have been discussed here and further in the briefs. If the state, though, is going to—the compelling interest, to answer your question directly, is directed towards how they have chose to frame the execution. For instance, the size of the execution chamber. The prison shows the size of that execution chamber. Under our LUPA, a prison entity can be required to spend some money to alleviate— Well, that's not the compelling interest, right? That goes to how the state is structuring the execution and how it chooses to carry it out. I mean, the compelling interest may be prison security or, you know, as you say, the humanity, carrying out the execution in a humane and safe way, but the size of the execution chamber I don't think is the compelling interest, right? I completely agree. The compelling interest is in the safety of—that's what prisons do. They're risk management operations. I guess one can construct a perfectly safe operation where no one, lawyers, reporters, anybody was ever allowed to see an inmate. Prisons are tasked with managing risk. One has to show the ID and a background check and paperwork and so forth, which the state is free to and did and is doing of any pastor who wants to come in for these circumstances. So, yes, the state absolutely has a compelling interest. I embrace it completely. And yet that compelling interest, if you're going to go to the next step, the state—it's not that they could not necessarily do something different than other states the federal government is doing. But you're talking about least restrictive alternatives. I just wanted to know about compelling interest. You answered the question. Thank you very much. Thank you, counsel. Mr. Fagan. Thank you, Mr. Chief Justice, and may it please the Court. As the submissions to this Court, including today, reflect, there are continuing factual disputes on many issues that we think ultimately warrant a remand. And we'd like to think that better explaining the federal experience may be helpful for further review. We agree that Texas can vindicate its compelling interest by substantially limiting physical contact with the inmate and vocalization by a spiritual advisor in the highly choreographed and sensitive execution procedure. But our recent experiences suggest that a categorical ban like Texas appears to have isn't the least restrictive means for doing so. To justify such a ban, Texas would have to offer—its experts would have to offer state-specific reasons why it's necessary. I'm happy to take the Court's questions, but one way in which I might be a little helpful is just to tease apart the word execution, which I think is just used as an overarching term in both some of the briefing and especially in media reports. There are really two relevant phases that occur when both the inmate and his spiritual advisor are in the execution chamber together, separated by before the drugs are administered and during the administration of the drugs. And obviously the second part, which in our experience takes about five to eight minutes, is the more sensitive portion of the procedure. So we do think it's helpful to think about this case in terms of—it may be a little bit like a box. He's making two claims, one for physical contact, one for vocalization, and there are two parts as relevant here of the procedure, one before the drug and one during the drug. We think Texas has a very strong argument to resist physical contact during the administration of the drug, and we have not allowed that. We think, conversely, that Petitioner has a fairly strong argument for vocalization before the administration of the drug. In fact, if you look at page 16A, paragraph 11 of the Lumpkin Declaration, I don't think they even really address why they couldn't accommodate that. And then the other two boxes, vocalization during the administration of the drug, and I can talk a little bit more about that later, and physical contact before administration of the drug are a little bit more indeterminate and could benefit from some further factual findings. I apologize, Justice Thomas, you appeared to want to ask a question. Well, I think you've come close to answering it because I'm interested in what would be precisely, in this context, the state of Texas. I know you've generically talked about it. What would be the least restrictive means in this case? Well, Your Honor, I can't answer that question definitively, in part because I really do think it depends on some factual circumstances that I don't know and certainly aren't in the record. I can share what the federal experience has revealed. We have, although it isn't the way we would have necessarily ideally set up the procedure, we've allowed vocalization essentially throughout. Obviously someone can't interrupt the marshal while they're announcing the judgment or when someone else is speaking, but we've allowed vocalization essentially throughout, through both phases of the execution, and we've allowed physical contact one time, briefly, before the administration of the drugs began. In every instance where we've had a spiritual advisor in the chamber, the spiritual advisor has been well away from the inmate as the drugs are actually administered. And the next claim would be obviously a little more contact, but I want to ask you something that's different, okay? So we have RFRA and we have RLUPA, and we normally under RFRA would rarely discuss the sincerity of beliefs. Is that analysis different under RLUPA considering the opportunities for gaming the system? I think sincerity is quite relevant under, frankly, both statutes, Justice Thomas, but I think you're quite right that in the RLUPA context there may be particularized incentives for someone to falsely claim a religious belief, and some of those concerns are manifest here and would need to be developed a little bit further. Obviously it raises one red flag that something different was claimed in the 2020 litigation, and now we have the state's lodging, and that's what I was also citing earlier, the state's lodging, and at page 25A of the redacted declaration, you can see the representation is made that on the day he thought he was going to be executed, the only reason he wanted to meet with Pastor Moore was he represented because of the pending litigation, which raises further sincerity concerns. We took sincerity as a given here because the lower courts did. They, as we understand it, essentially just considered the narrow tailoring analysis and almost nothing else past that, but we do think that's an issue here. Mr. Fagan, what is insincere about there's steps to this? There's a certain amount of time in which an inmate is given with his family, correct, and presumably with the pastor if he wants it before the execution, correct? Yes, Your Honor. And here he decided not to have the pastor there, correct? I believe his—if I'm understanding the declaration correctly, Your Honor, I believe his pastor was there, but he chose not to meet with— He wanted to meet with his family. How does that take away from his desire to have the pastor in the execution chamber when he's dying because the whole purpose of the religious belief is that you should have a pastor to help guide you to the other place? So, Your Honor, I am not suggesting how a court should come out if it considered these facts. I am simply suggesting that given the combination of facts, and in fact Petitioner in the reply brief said he would welcome a hearing at which he can have a chance to explain or maybe even cross-examine these facts. Do you have any reason why we shouldn't enter an order like we did in Murphy, which is send it back, let these issues be trashed out, but let Texas decide whether it wants to execute him in the meantime? Because it does seem as though sending it back would cause delay, but it's within Texas's freedom to choose to accommodate him and go ahead, correct? Well, Your Honor, I think essentially we don't disagree that the court should simply remand. I'd add that there's been no dispute with the representation in our brief, so I take it to be correct under Texas law, although I'm no expert in it, that pages 32 and 33 of our brief, that under Texas law, there'd have to be a 90-day waiting period between a court setting a new execution date and the actual execution, which means there would be at least 90 days to develop a further record on some of these issues. And also, regardless of whether there was proper exhaustion here or whether the absence of exhaustion could be excused as unavailable, I do think there are some continuing factual matters that the parties might be able to work out between themselves as far as exactly what petitioner is requesting and exactly what he would be satisfied with and how far the state can go to accommodate that. That's exactly why exhaustion is so important, because it not only allows for some consensual resolution but might really crystallize the dispute into a dispute of a much smaller nature. Either we're just talking about one of the boxes I mentioned earlier, or maybe even just a simple component of one. That seems useless here because they didn't give a response for six weeks. Well, Your Honor, I think that goes to whether the grievance process was properly exhausted and whether they were on notice that there was a specific request for vocalization and at what point petitioner was aware that that would be limited, which are also factual issues that could be explored. And perhaps I am being overly optimistic about the degree of accommodation that could be reached between the parties, but I do think that further development during at least that 90-day period and possibly longer, as you noted, it's obviously under Texas' control when it decides to set the execution date and carry out the execution. Some further degree of development in the lower courts would be tremendously helpful, not only so the courts can properly resolve this, but also for purposes of the parties themselves. Mr. Fagan? I don't understand how the prison officials and then judges are supposed to assess sincerity. I mean, it is certainly understandable that as death approaches, inmates may have different religious views than they did before and want to take those into account. I mean, let's say a week before a prisoner comes in and says, I want to become a member of a particular church because I think I need that to be saved. And the period, the training, whatever the initiation is, three months, and it's very sincere. What happens then? Well, Your Honor, if the court believes it's very sincere, I'm not sure. We have no reason to doubt the sincerity. I think that's somewhat how the lower courts took this case. I think it is difficult to determine sincerity. It's nevertheless a requirement that the statute include. Even if he says, you know, the process for me to reach the point under which I feel that I can, you know, the religion would benefit me is three months. Well, Your Honor, I think there are, if I could take this out a little bit and just talk about the universe of religious claims for a second, this is a particularly, for reasons you just mentioned, difficult subset of that. But just generally, I think it is a very robust requirement that courts have been able to use to eliminate certain frivolous claims like my religion requires me to be a marijuana distributor or something to that effect. I think it gets somewhat more difficult, Your Honor, in this context, and it might well require something like an evidentiary hearing here. And I think what makes, I think there will be cases in which sincerity has certain red flags on it, and I think this case may or may not be one of those. But in a case where it does appear that the inmate has a sincere religious belief, the court would have to proceed to the further steps. Thank you, Justice Kagan. May I ask more about the BOP experience? I mean, as I understand it, there were 13 recent executions. In 11, there were spiritual advisors there. You said that all of them, you allowed vocalization throughout the process, but in only one was there touching, and that before the drugs were administered. Is that basically, did I get that right? Yes, Your Honor, with two very small caveats. It's a little bit unclear, just because no one was focusing on this when they made their records. It's a little bit unclear whether all the vocalization included vocalization during the administration of the drugs. It may have, it may not have. And also, I think in one case, it was just conversation before and not actual practice. Here's what I'd like to know. I guess I'd like to get a little bit more texture about how the process played out. In other words, you know, when you got these requests, you being the BOP, what did the BOP do? Were there discussions? Were there requests that were rejected? How does this all get managed in the experience of the BOP? As I understand it, none of these ever came to a court. Is that right? I mean, they all came to a court, but not with respect to the religious claims. That's correct, Your Honor. There were some refer claims with the recent executions, but they didn't relate to this specific issue. So how does this all get done? Essentially, Your Honor, we resolve them informally. We'd have discussions with the inmates and or their spiritual advisor about what it was that they were proposing and internal discussions about what could be accommodated. I don't think we accommodated every single request that was made. What kind of requests did you reject? Your Honor, I'm not aware of any specific requests that we rejected, but my general understanding is there may have been requests that we did not. My concern is representing the court that we accommodated everything that was requested of us. I'm not certain I could make that representation, but everyone was clearly satisfied enough that we avoided last-minute litigation. There was no touching, right? There was no touching. So someone had requested touching. But there was touching in one, is that correct? There was. Wasn't there communion given in one and use of holy oils? Well, Your Honor, our recollection of that one is a little bit different from Father O'Keefe's recollection of it. But our recollection is there was at least some touching, but that was during the period before the administration of the drugs. And we don't think it was communion in the sense of giving someone a wafer on the tongue or anything to that effect. Thank you, Counsel. Justice Thomas? Yes, Mr. Fagan, I do have a number of questions. Rialupa, like RFRA, like the pre-Smith free exercise jurisprudence of this court, requires an individualized determination. That's been the law for a long time. RFRA has been on the books for a long time. It's a completely workable standard. It's regrettable it wasn't extended to the free exercise clause, but it is individualized. And what would be most helpful here, I think, is if we could at least identify sort of a gold standard, not to preclude individualized variations, but something that will generally be sufficient to take into account religious demands regarding the two things that are at issue here, touching and vocalization and accommodation of the state's interest. And we could look to the BOP doesn't get to specify what the First Amendment requires or what Rialupa requires, but it's a starting point. And so you said what has happened in the past. If there are federal executions in the future, what will the BOP do? Will its policy be no touching during the execution, vocalization allowed throughout the execution, so long as it doesn't interfere with other communications that have to take place? Your Honor, I can't quite represent accurately under any circumstances exactly what BOP would do. That's unfair, an unfair question. So let me look back. That was what BOP apparently thought was appropriate during the executions that took place last year. Well, Your Honor, I want to be a little bit more nuanced about that. I think what the BOP was doing was making individualized judgments about each particular case, and then we're kind of mapping out how that shaped out if you look at the entire universe of the 13. Well, I wonder if you could be a little more helpful. What does the BOP regard as sufficient to satisfy its interest in security and in having executions carried out without any interference? Well, Your Honor, if we wanted to have the risk be absolutely zero, there would be no spiritual advisor in the chamber whatsoever. However, BOP was able to carry out 11 executions with a spiritual advisor in the chamber. It had a security person next to the spiritual advisor at all times. The position of the spiritual advisor varied with the phase of the execution, as I've described earlier. The BOP does do some auditory monitoring during the administration of the drugs, in particular listening for any drip from the IV lines, and it is also listening for a particular snoring sound from the prisoner that would indicate the pentobarbital is working as it is supposed to, and the chanting and praying sometimes could interfere with that. The BOP may do with visual and EKG monitoring, and nothing went wrong when they did that, fortunately. The BOP, I think, did not get a request to physically touch the inmate during the administration of the drugs. I think they would have very, very substantial concerns about that because of the risk of either advertent or inadvertent disruption of the IV lines. That risk may be low, but the harm, as Justice Barrett was mentioning earlier, would be extremely high. Also, unlike an actual prison employee like a state or federal chaplain, the outside spiritual advisor would need to be removed if the medical team had to come in, and that in itself could cause delay or problems. And frankly, Your Honor, I also think blocking the witness's views, which now you're requiring two people, the outside spiritual advisor and the security person, is a legitimate concern here because one of the purposes of capital punishment is to provide some closure to the victims, and of course we believe the inmate's family should be able to witness this as well. And blocking either of them from fully viewing the inmate at the time of the execution is an important factor. Well, all that is helpful now to follow up a little bit. We have a picture of the execution room that Texas uses. I don't know whether the execution room that the federal government has is a matter of public record or anything about it, but can you tell us whether there's anything that is materially different about the room that the federal government uses or the procedures that would suggest that the considerations in Texas should be different from the considerations in Terre Haute? As to the chamber, Your Honor, ours has about twice the square footage of what I understand Texas's is, which is what enables us to have the spiritual advisor about nine feet away during the administration of the drugs. Before the administration of the drugs, the spiritual advisor was advised to stand at a line that's taped on the floor that's about 28 inches away from the gurney. I don't know that the precise procedures we've used there would be feasible for Texas with its smaller chamber. I'm also not entirely clear on what Texas's monitoring equipment exactly looks like or the positioning of its windows. We have separate galleries for the victim and inmate witnesses as well as the federal official witnesses, and then another one for the medical team, and they all need to be able to see in for one reason or another. And then there's auditory monitoring equipment and medical monitoring equipment that may differ there as well that may raise some concerns too. I'm sorry to take up so much time. If I could just ask one more question that relates to something that to my mind is related to this, although it's a different subject, and that is I'm interested in BOP practice regarding religious services during a typical weekend. So on a Friday, Saturday, Sunday in a federal prison, what religious services, if any, are prisoners allowed to attend? Do you know the answer to that? Your Honor, not as I stand here today. Thank you very much. Justice Sotomayor? Justice Kagan? I have a few follow-ups. I share Justice Alito's desire to have what I would call a bright-line rule or something, some guidelines, if Petitioner's position were to prevail here, and it's helpful, your explanation of what happened in the federal executions, but I want to make sure, following up on Justice Kagan's questions, I understand what happened. There was no touching except in one, is that correct? That is our recollection, your Honor, yes. There was someone present in 11 of the 13? Yes. And they spoke aloud in all 11 of those? In one of them, there appears to have just been conversation before the administration of the drugs. I'm sorry, keep going. I'm sorry. In the rest of them, there was at least some prayer, and again, because of the somewhat underdetermined word execution, it's not entirely clear whether the prayer was during the entire period or just during the portion as the witnesses were coming in and the spiritual advisor and the inmate were alone with the federal officials. And if I'm interpreting you correctly, but correct me if I'm wrong, you have much more concern. You're okay with someone being in the room, or at least DOP was during these, okay with audible. It doesn't seem like you're okay, as you stand here today, with someone touching during the execution, putting to the side, or maybe you don't want to put to the side the question of what the execution is. Well, your Honor, just to be clear, I mean, I'm not quite sure I'd represent that we were okay with it. It was just BOP was able to accommodate it. And I think BOP would have a vastly greater degree of concern for the reasons I mentioned earlier about accommodating a request to have the spiritual advisor in physical contact with the inmate. I mean, if I could just emphasize one thing that I think really came out in the Gutierrez litigation after this court remanded is that Texas points out, and I think they point it out here, but not to the same degree. It's not just a matter of not trusting a spiritual advisor. It's a very fraught circumstance. You don't know how someone's going to react in that circumstance. I mean, I realize this probably wouldn't happen to most people, but someone could faint, someone could stumble, and you could jostle the lines that might or might not disrupt them. But if that were to happen in the middle of the pentobarbital, all of the problems in, for example, the Lockett execution in Oklahoma were because the IV was going into the tissue as opposed to into the vein, and anything going wrong here would be catastrophic. And then to follow up on Justice Barrett's question and my earlier questions about the risk, the state's compelling interest in reducing the risk to zero or as close to zero as possible, given what we've mandated under RLUIPA, you said, I think, at the beginning, the state would need state-specific reasons to justify that, and I'm wondering how a state could say we have a state-specific reason for wanting to reduce the risk to as close to zero as possible. Well, I think this is where Holtz and Cutter's emphasis on substantial deference to prison administrators' expertise comes in. We certainly do not think that courts should be micromanaging prison procedures, but I think Holtz identifies the practices of other jurisdictions as at least another least restrictive means that the state needs to, in Holtz's words, give persuasive reasons why it can't follow. So if a number of other jurisdictions, and here the federal government in Alabama, have been able to allow outside spiritual advisors, I think what Texas would need to do but hasn't done yet and may or may not be able to do is to say things that are of the nature of what I was discussing earlier with Justice Alito. We have different monitoring equipment. Our chamber is not the same size as the federal government's. We rely more heavily on certain types of monitoring than the federal government does, and I also think they could legitimately decide to tolerate a lower degree of risk than the federal government was willing to accommodate. I think — Justice Barrett? Yes, Mr. Fagan, I just have two quick questions. One is to follow up. I think Justice Kavanaugh is asking a very important question about how do we define the state interest, and I feel like you gave him a lot of examples of least restrictive alternatives but maybe not the compelling interest. I'm just wondering if it's legitimate to define it as trying to get to zero percent risk because, you know, Justice Alito asked you about services on the weekends. I think, it's my understanding, I might be wrong, that BOP and state prisons too do allow some religious services, perhaps because of RLUIPA. If they said we want the risk of prison rioting or fighting to be zero percent, that would permit the prison right to say there can never be any kind of prayer service or gathering. But if the compelling interests were defined differently, like, for example, to say maintaining prison security, then that wouldn't rule out those kinds of gatherings. And so here, if a prison defines the compelling interest in saying, like, well, we in Alabama want a zero percent risk or we in Texas want only a two percent risk, that permits them to altogether bar the spiritual advisor from the chamber, right? Because there's not going to be any, you know, lesser restrictive alternative that's going to get you there. It always, it's inherent that it carries a risk. So how would the federal government articulate what the acceptable state compelling interest is? Well, I think RLUIPA kind of presupposes that you can't ever get to zero percent risk on anything for the reasons that you just mentioned, Justice Barrett. I do think courts are interfering a little bit too much under the Holtz standard if they're kind of micromanaging between, like, I mean, not that anyone could ever get precise empirical numbers, but, like, ten and five percent risk. But I think just to answer your question directly, it would be a question you ask my friend directly, we think the compelling interest here in this particular context is in carrying out the execution procedure effectively, which both means making sure it goes correctly for the prisoner and also making sure the purposes of the judgment are satisfied. And obviously, even having a spiritual advisor in the chamber does create some degree of risk, even if they're nine feet away. But I think courts could probably set a minimum bar on risk tolerance, and one place to look is the experience of other jurisdictions. I think courts should be very hesitant outside of that to start suggesting that these kinds of things need to be allowed. But if you see that other jurisdictions are permitting them, it places under Holtz at least somewhat of a modest burden on the state to give some reasons, which would themselves get deference for their administrators, as to why they couldn't similarly accommodate it, and they may well have such reasons here. One other just brief question. Justice Kagan was asking you about how BOP carries out these executions and determines its standards, and you said it was an individualized process with respect to each of the inmates. Presumably, though, BOP had to make some decisions about standards that would apply to each one. Like you mentioned, there was tape on the floor, and the spiritual advisor had to stand in the tape so that there would be a security officer present. Was there any kind of discussion or consultation with prison administrators or experts before the 11 executions were carried out to decide, well, this is the minimum, they can't get any closer than this tape on the floor? I'm not precisely sure why they decided on that specific distance. I think they wanted to allow them to be close for that portion of it, but not too close. The concern there was simply making sure that the security official would still be in position to try to stop the advisor from doing something that might interfere with the execution. I don't know the precise content of the discussions that BOP had ahead of time, but there was clearly a great deal of thinking. Even during periods where federal executions are in a moratorium, they rehearse this essentially semi-annually, what the procedures are going to look like. It's a very choreographed procedure with a lot of thought into it. Sorry, Mr. Chief Justice. Thank you. Thank you, Counsel. General Stone. Thank you, Mr. Chief Justice, and may it please the Court. Petitioner has twice received the extremely exceptional remedy of having his execution halted at the last minute. Each time he litigates around an execution date, he receives another lengthy reprieve. This Court should not countenance the delay of a fourth execution date. Ramirez claims that he has consistently sought the same relief, namely his pastor's touch and audible prayer, throughout his piecemeal litigation. There are two problems with that assertion. First, it's false. Ramirez disclaimed in 2020 that he wanted pastoral touch, and in April 2021, Texas gave Ramirez all that he had been looking for at that time, his pastor's presence in the execution chamber. Second, Ramirez's assertion makes his litigation conduct inexplicable. If Ramirez was aware for the entire time that he wanted pastoral touch and audible prayer, then he has no excuse for failing to timely raise and grieve those requests. Ramirez tries to excuse both his delays and his failures to exhaust by claiming he only learned he wouldn't be permitted touch or audible prayer in June and August of this year, respectively. Again, false. The state's execution procedures, publicly available as of this April, state that a pastor may, quote, observe the inmate's execution. An observer's role is passive, not interactive. Ramirez knew his pastor's observation and his pastor's participation were distinct because he himself distinguished them. Ramirez stated in August that he assumed his pastor could not audibly pray, and he distinguished touch from presence in his 2020 suit. Ramirez has delayed in seeking accommodations, reversed his litigation positions, and raised his claim to seriatim, all for the purposes of delay. This court should put an end to these tactics once and for all. I welcome the court's questions. Counsel, how would you deal with the hypothetical I was raising earlier, which is, you know, a few days before execution, the prisoner says, I've decided I need to convert to a particular faith, and the process takes three months. And there's a religion in which that is true, that it takes three months. What would you do? Certainly, Your Honor. So for purposes of, and I assume that this prisoner is raising a reluctant claim and asking for a preliminary injunction against his execution? Yeah, because it takes three months, and that's what his, the faith that he wants to pursue takes. Well, Your Honor, first I think the court would have to determine whether or not that was a sincere conversion. Well, right, that's what I'm asking you. That's right. What would you do to make sure you've accommodated that concern? The court would go into a pretext inquiry as discussed in the RFRA context in footnote 28 of Hobby Lobby. It would look into factors like, for example, how has this individual behaved in the past? Have they made any changes? He had a conversion experience. I suspect impending death focuses people's concerns on religion in a way they may not have been before, and with death imminent, he decided he needed this, needed to pursue this route to salvation. On just those facts alone, Your Honor, it would sound to me that with nothing else, that the individual might be seeking delay of his execution because several days beforehand, he's requesting a multi-month process, but I think that would be a credibility determination. Yeah, I understand that, but how would you do that? I mean, it is a factually plausible thing. I mean, people convert, and particularly in times of stress, there is a church that requires three months. Maybe he's not sincere, but how do you tell? You'd look at other collateral circumstances such as whether or not there had been previous contact with a pastor that sort of engendered a spiritual relationship beforehand, whether or not the person had raised similar claims beforehand, and if so, when relative to previous execution dates, whether or not this individual has brought other basically pretextual or baseless lawsuits. I think these would all be the kinds of facts and circumstances that would help a district court make the familiar inquiries to whether or not basically they're being lied to, the same pretext inquiry that occurs in virtually every area of law. Undoubtedly, because this is a very sensitive area of law and a very sensitive area of human experience, it's going to require an examination of a lot of facts and circumstances around the individual, and it may be the case that district judges making this factual determination for the first time are going to tend to give some deference to an individual on the surface of things. But Congress has placed that initial burden on the individual trying to show sincerity, so at a minimum, that person has to start by adducing some proof that they have a sincere need. General Stone, can I ask you, you just said that the April 2020 policy said that the prisoner could have a spiritual advisor observe in the room. Could you direct me to where it says that? Because I'm looking at the policy, and it talks about the spiritual advisor being present in the room, and I think that's a significant difference. So does it say observe? It's the April 2021 policy, Justice Barrett. Let me get you that page. I'm sorry, I'm looking at the April 2021 policy. Maybe you could get that for me. Of course. It's on page 149 of the Joint Appendix. In Part D, Part 1, it says, to read the relevant quote, if requested by the inmate, towards the bottom it says, will be escorted into the execution chamber by an agency representative to observe the inmate's execution. Okay. Thank you very much. Well, I mean, I've gone through what we have in my chambers, the dates, and there's an argument about this. I mean, they say, look, you used to allow spiritual advisors in, no problem. Then you decided in 2019, no, they can't come in. So in 2020, after we got through with it, he says, please let them in. Okay. And he doesn't say anything about laying on of hands because, you know, letting them in is better than nothing. You say, no, they can't come in. Then we get to 2022, and he says, come on, let them in. And you say, okay, we'll let them in. And at that point, they say, huh, pretty good, fine. And we want the hands in the audible prayer too. That's what you used to do. And you say, ha, you didn't ask for that before. Of course they didn't. They thought they couldn't come in at all. Now you're asking for it. All right. The answer is no. All right. So here we are. And as I go through this, I think they have a point. Maybe you have a point. What are we supposed to do? Send it back for that? Two points, Your Honor. I think there are at least two clear places where Mr. Ramirez certainly should have had notice that he needed to look into this. The first one is in 2019, when TDCJ first changed its policies, partially in response to this court's decision in Murphy. At that point, TDCJ's policy was no pastors in the chamber at all. Because what he wanted was not only a pastor in the chamber, but other things that are sort of logically subsequent to that. By being told you may not have a pastor in the chamber, he's being told you may not have any of those other things. It's very technical, and it's excellent lawyering. But, you know, you sit there and you read it, and you used to let them in, and now he reads it and says, nope, they can't come in. And we have the case still, and finally it gets out of here. And you go back and, nope, they can't come in. So obviously he says, please let them in. And then finally when you change and let them in, he says, by the way, we would like hands plus, I'm just repeating myself, hands plus audible prayer. That's what you used to do. Now, as I say it like that, you know, it sounds as if they've been fairly reasonable. But as you say, well, you say, but they didn't really ask for it. I say, okay, you have a point. And so my question was, what do we do about that? And I have a question on the merits too, but go ahead. Sure. Well, Your Honor, this court's rule is articulated in Hill and in Bucklew, places the obligation on the capital inmate who's going to raise claims to do so in a diligent manner so as to not require an equitable release staying his execution. He's under that burden, and an obligation, a burden of bringing claims diligently, includes a burden to investigate. Okay, okay, I got your point. Now, on the merits, I'd like to know this. Do you have any idea how many executions have there been? Let's go back 100 years. Okay. Where they did let spiritual advisors in somewhere. I don't care, United States, do it as you want. They let the spiritual advisors in. There was a physical touching, and there was audible prayer. Was the answer zero? Certainly not. No, certainly not. What was the answer about? Can you guess? It was a commonplace in executions in Texas between 1982 and 2008. From some place to commonplace. In how many of those did the audibility and the physical touching create the execution going astray? Are you aware of any? No, Your Honor, though I would point out. So we have experience, and there's never been a problem. All right. That's what you think. I mean, I don't know if you think it, but at least that's the best you can answer. I would also add an important distinction, Your Honor, is that for every one of those circumstances, the individual is a TDCJ employee. And it turns out TDCJ is a correctional institution dealing with the extraordinarily charged and choreographed area of a death chamber. There's a very significant difference between having an outsider with no relationship whatsoever. Are you aware in any other states of an execution going astray because of an outside spiritual advisor? No, Justice Kagan, though we reached out to other states, and because this is very new in a handful of jurisdictions that allow it, I'm not surprised that we have none of them. This is the sort of thing we would anticipate to be a very low likelihood of occurring. It's just that it has a catastrophic potential damage to it. I asked Mr. Fagan and your friend on the other side about what the definition of the state's compelling interest is. Could you give us yours? Of course, Your Honor. I think Justice Kavanaugh accurately or almost accurately summarizes that we're attempting to minimize risk almost all the way to zero as much as we reasonably can. I take the point that you have that if that's the state's compelling interest going forward in all sorts of contexts, that sounds an awful lot like a license for the state to just reject religious claims. I think the court's articulated deference in Holt v. Hobbs and other similar cases, and the sort of span of that deference is what does a lot of work in this case. So, for example, this court rejected deference to these sorts of claims of minimizing risk in Holt precisely because the policy is under-inclusive. It seemed incredibly hard to believe that contraband could be held in a half-inch beard, situations like that. To the extent that you have a correctional institution saying that we have to ban all church services because there's too high of a chance of a riot, it sounds not hypothetical, it's just a very bad ends-means fit between the thing that was ultimately chosen and the pursuit of the sort of minimization of risk, or at least a policy that appears to be sacrificing a whole lot of potential RFRA rights. And in that case, I think that the court's deference to the stated security concerns of the agency should be a lot lower, if only because, like I said, you've got this very over-inclusive sort of policy. And these over-inclusion and under-inclusion analyses are very typical of when this court says, well, we defer to prison administrators as experts, but we're not sure about this particular policy. I think that would take care of at least a lot of the concerns that you have. You have to think about the risk together with the harm, correct? That's exactly right. So the risk is low, but the potential harm, as you used the word, and I think Mr. Fagan agreed with this, catastrophic or some adjective similar to that, so those two things need to be thought about together. That's exactly right, Your Honor. Texans being unwilling to tolerate a very small amount of risk in the death chamber, where a tiny amount of risk can lead to a situation that would create intolerable pain for an inmate or intolerable amount of reliving of suffering for the victim's families or any number of these very high negative value problems. What about Mr. Fagan's description of the experience and then our effort to balance the competing interests here under a test, the strict scrutiny test that is difficult to apply here, as I think everyone would acknowledge. The advisor is allowed in the room. There can be audible prayer before the drugs are administered. No touching. Is that something Texas could live with? Well, Your Honor, one of the major problems was alluded to in the logistics of the federal execution room is this is just much, much larger than Texas is. I might point out that's one major difference because in Texas we can functionally only have about three people. It's about a nine-by-twelve room. Most of one wall is taken up by windows for the inmate, for witnesses on behalf of the inmate's families. The other is witnesses of the victims. On the other side we have a large window for the medical team to view and IV lines coming in. So the much smaller space makes it much more difficult to navigate. In terms of the sort of general point that I think you're getting at as to whether or not Texas might be able to accommodate something that was significantly less intrusive of a request, Texas is obligated under RFRA and RLUPA to take these prison requests one at a time. In the event that someone said, I want a five-second blessing and then my pastor can step outside, that would be obviously something that would be much less intrusive, that would bear much less of a risk, and that Texas would have to have an awfully good reason to refuse. The reason why that doesn't work here is because Mr. Ramirez is insistent that he's wanted the same thing the whole time. He's wanted touch and prayer the entire duration of the execution from beginning all the way to end. The size of the room did not prevent many, many chaplains in Texas' history from providing both touch and prayer, is that right? No, Justice Kagan, but it did indirectly in that when we had chaplains in the room, we didn't need to have another security officer in the room. And so the fact that we have a volunteer coming into the room, the chaplain now has to be accompanied by a security officer, which required us to take out the warden. So it did change how we had to run the room, but the chaplain himself did not add to the risk. That was, again, the state official, right? Yes, Your Honor, it was. That's right. That's different, at least to me, that's a somewhat different situation. It may not be to others. You were switching, though, to sincerity in this case, and I get you have a whole argument about sincerity in this case, but we may also have to opine on compelling interests and least restrictive alternatives. Just on the looking to other states, how do we do that? You know, Alabama does it, why can't Texas? That's the argument, and I'm simplifying, but that's kind of the argument on the other side as to some of this. Your response? Sure, Your Honor. In particular with Alabama, I think the court, however it's going to set down rules, needs to make sure it's really engaging in an apples-to-apples comparison. The request in Alabama was much briefer. I understand that it was a brief touch with holy oils that essentially administered the last rites, and that's something significantly less intrusive risk-wise than what's being presented in Texas. All else equal, if someone in Texas were to present that same request as in Alabama, the fact Alabama was able to provide it would be a piece of evidence, not necessarily dispositive, but we something to the extent that Alabama has a similar execution protocol in a similar execution room. General, why isn't the inquiry really exactly how Holtz laid out the inquiry? In other words, you know, in Holtz, prison officials came in and said, men can put contraband in their beards, and we have a security interest in preventing that. And what the court said was, you know what, I mean, that might be, but we're going to look around at other states, see what other practices are, to the extent most other states or many other states can deal with the security interest in a way that also respects religious interests of the inmate, then we're going essentially to say to the state, why not you too? And in all of that, there is an appropriate level of deference given to prison officials, but there's also an appropriate level of respect given to the inmate with religious convictions as commanded by Congress. I don't think we're very far apart, Justice Kagan. I think that to the extent that we're dealing with many states that are similarly situated as in having the same kind of execution protocol and similarly substantial execution rooms, that if many states had that same experience, that in fact there wasn't a risk  and that would be powerful evidence that a given state, for example Texas in this case, couldn't legitimately say we can't do this without unacceptably adding to our risk. I was speaking more specifically to the extent that this court's going to look at other states as like examples for purposes of engaging in exactly that kind of state comparison that you bring up, Justice Kagan, but the court's making sure it's getting like things like. And the kind of fact that might fall by the wayside for purposes of comparison is the federal government has just a much larger chamber. And that's an important fact. Whether or not it should be sufficient to justify a policy difference in one or many cases, that's obviously going to be case specific enough to this court, but that's sort of what's exhorting is that you can't take one particular institution or one particular execution as dispositive for that analysis. If Mr. Ramirez is going to be executed, would a new execution day have to be set? Yes, Justice Alito. And that would have to be at least 90 days from when? As a practical matter, Your Honor, first of all, a date has to be, a state court has to be petitioned to set another date. No state court in Texas is going to do that while this court has a case on the merits pending regarding given execution. After that occurs, it would be at least 91 days from when the trial judge grants the motion. As a practical matter, it tends to be about four to seven months, as this court could see, regarding Mr. Ramirez's date. And would there be any reason why Mr. Ramirez could not exhaust any grievances he has about the way the execution will be carried out during that period? Well, Your Honor, I believe he actually, so he hasn't exhausted either of the two as of right now. The exhaustion came after he'd filed his lawsuit in physical touch, so I believe if that were dismissed for exhaustion, that would be without prejudice, or at least would lead to refile based on the district court's analysis of that. The other audible prayer one, he's had notice of that for more than 15 days. This court in Woodford has noted that a prisoner has to engage in exhaustion proper, not just exhaustion simpliciter, and because TDCJ's consistent policy is that you have to raise first step grievance within 15 days of the arising of the problem, his refusal to do so would mean he couldn't exhaust that one. Counsel, I understand that prisoners, you don't have any rules that say that prisoners can't pray out loud during the execution, correct? No, Your Honor. All right, so you tolerate their noise. Number two, you were talking about the fact that you didn't understand his request in June to touch and pray over me, that it would be verbal. How was he supposed to understand from the word observe in your April 21st change of execution policy that observe meant no touching and no praying? Observing, it had happened before, so all I'm suggesting to you is you can defend your position, and he's defended his. To me, silent prayer, you don't have to ask permission for. I suspect that many of your people in that room, even though they're DOJ employees, also pray silently, and no one would question that their prayer would be in their head. So all I'm suggesting is lack of clarity exists on both sides. But you can fix yours by making your rules clearer. He tried to fix his by filing a grievance less than a month, weeks after you announced your policy on May 4th. You returned his grievance saying your spiritual advisor can come. Weeks later, petitioner's counsel emails you and asks you if touching will be allowed. June 11th, three days later, petitioner files his grievance and says allow more to touch and pray over me. You deny that almost a month later, July 2nd, and on July 8th he files a grievance, but you don't respond to that over a month later. What were you doing six weeks later? Your Honor, if I recall correctly, we responded in 36 days. TDCJ's manuals state that these grievances can take up to 40 days to respond. We try to be faster. TDCJ receives questions. Why were you so slow here? The execution is going to be in September. If you don't want there to be delay, what took you so long? Well, Your Honor, TDCJ still responded within the amount of time that the manual says. Yeah, but at some point that becomes ineffective as a remedy if you're going to butt up against the execution date purposely. Respectfully, Your Honor, I think that means that Ramirez was under an obligation to bring his grievance earlier. At a very minimum, passing by the public announcement of the change protocols, passing by the fact that he had noticed everything he would have needed to bring his relupa lawsuits in 2019, he received actual notice in the form of his return grievance saying, you may have your password in May 4th, I believe. And within weeks, he filed his grievance in the same amount of time that you took to deny it. He's in May 2021, Your Honor, and he has a September execution date. He waits to file his first grievance not May 6th, 7th, 8th, 9th. He waits until the middle of June. So he takes a third of the time he has left for purposes of figuring out whether or not he's entitled to the extremely exceptional stay of an execution at the last minute. Spends it not grieving. Then he gets a grievance in. Then TDCJ takes much less than the 40 days back. 36, 4 days left. In the return of the June grievance, I believe we received it on the 14th. We returned it on July 5th for that first step grievance. So far faster than 40 days. We returned it certainly diligently. Then he files a step two on the 8th, and then we end up filing 36 days. We end up returning it to him 36 days later, and he's already sued. At a bare minimum, if Mr. Ramirez thought that the grievance process was unavailable, which he'd be incorrect about legally and descriptively, at a minimum, then he shouldn't have waited until the very end to bring his lawsuit. If he was going to go and file a lawsuit regardless of whether or not he'd received the second step grievance response, then he should have done everyone a favor and sued in May. Thank you, Counsel. Justice Thomas, anything further? No. Thank you very much, Counsel. A rebuttal, Mr. Kretzer? Yes, Mr. Chief Justice. I think perhaps one of the most alarming things that my friend, General Stone, said in his argument was that the TDCJ now has the affirmative power under their logic to front run, impede, cut off, whatever you want to call it, the ability to file a 1983 case by their delay on the Level II exhaustion. The three most catalytic pages of this entire record in the Lodge materials, 11, 12, and 13, is also at page 53 of the Joint Appendix, and this is where Mr. Ramirez filed. This was in June that he said the quote in pray-over-me language. It was denied and boilerplate on July 2nd. The August 16th denial, this is on page 13, has the exact same language. Someone literally just took the same typewriter and put the exact same thing and stamped there on August 16th. It sat there for six weeks. This, page 13, appears in the Lodge grievance file. It's not in the Joint Appendix because it was never received by the attorney. In other words, TDCJ, Mr. Stone said they can take up what we've returned in 36 days, we have 40. Under their own internal protocols, they could give themselves another 40 days to respond to it, in which case they would have returned the Level II grievance after Mr. Ramirez was already executed. That is the implication of how they are trying to construe exhaustion in this case, and there were several questions to me in my opening about what would the larger implications be for other cases. If this Court adopts Mr. Stone's logic, I predict you will see the word go out to prisons across the country that they now have this wonderful tool to insulate their policies, whatever they may be, from federal review under 1983 because they can put off the Level II grievance as long as they care to. I would point out, Justice Kavanaugh, you asked me in my opening about the risk of, as you perceive, the non-TDCJ employee chaplains being greater than TDCJ employee chaplains. I would just point out that the drug team members are not TDCJ employees, and the botched executions you've heard about from both sides, most famously Mr. Lockett in Oklahoma, those botched executions were apparently caused by these individuals who were not TDCJ employees. If the real concern is the compelling interest, the safety of the security protocols of the execution, I would submit history has shown that it's these non-TDCJ, non-prison employees in these other cases that have caused these executions, not anything caused by any chaplain. There simply exists, as far as everyone has looked for 100 years, Justice Breyer, or longer, there's not a single instance of any chaplain ever causing any such disturbance. Thank you, Counsel. The case is submitted.